## Miller & Damron v. Batten.

(Decided Feb. 10, 1933.)

SANDIDGE & SANDIDGE for appellants.

BEN D. RINGO and LAVEGA CLEMENTS for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

On August 17, 1928, the appellants, J. C. Miller and W. W. Damron, partners doing business under the firm name of Miller & Damron, sold to the Three Sands Oil Company an undivided one-third interest in an oil and gas lease for the sum of $36,000. This is an appeal from a judgment of the Daviess circuit court awarding appellee $1,080 as a brokerage commission on the sale.

A reversal of the judgment is asked because the circuit court erred: (1) In overruling the appellants' motion for a directed verdict; (2) in giving and refusing to give instructions; and (3) in sustaining a demurrer to the amended petition filed by the appellants in which they pleaded appellee's failure to comply with certain ordinances of the city of Owensboro which declare it to be unlawful to engage in the brokerage business without procuring a license.

It is argued that the motion for a directed verdict should have been sustained because (1) the alleged contract of employment was too indefinite and uncertain; and (2) if the facts were sufficient to constitute a contract for a brokerage commission, the appellee had abandoned the contract of employment and was not instrumental in making the sale.

In 1928, the appellants were the owners of many oil and gas leases in Daviess and Ohio counties and were engaged in developing these leases. The appellee was also engaged in the oil business and was interested in a number of leases adjoining, or in the vicinity of, some of the leases owned by appellants. He alleged in his petition that he was employed by the defendants in April, 1928, to obtain a purchaser for all or any portion of their oil and gas holdings in Daviess county and that they agreed to pay to him as compensation for his services in procuring a purchaser an amount equal to 3 per centum of the purchase price obtained for any property sold by them to a purchaser procured by the plaintiff, and that pursuant to their contract of employment he induced representatives of the Three Sands Oil Company, a corporation of Terre Haute, Ind., to come to Daviess county and inspect the properties of the defendants with a view to purchasing some portion thereof, and that as a result of such inspection and subsequent negotiations between them and the defendants, initiated by the plaintiff, a one-third interest in a certain oil and gas lease was on August 17, 1928, sold to the Three Sands Oil Company for the sum of $36,000. The answer was a traverse.

The appellee testified that he was told by W. W. Damron in April, 1928, that the firm of Miller & Damron needed money and wanted to sell some, or all, of their holdings, and Damron asked him if he knew any one that might be interested. Appellee said he knew a

man who was financially able to purchase the leases and who might be interested in the properties owned by the firm. Damron told him to "bring him down" and agreed to pay appellee a commission of 5 per centum on all sales made to any person introduced by him. He wrote to Mr. J. G. Gambril of Terre Haute, Ind., a representative of the Three Sands Oil Company, and received a reply from Gambril stating that he was willing to inspect appellants' properties with a view to purchasing them. Appellee delivered this letter to Damron, who promised to write to Gambril. A few days later Gambril wrote to appellee and stated that he had not heard from appellants. Appellee then went to Terre Haute for a personal interview with Gambril, as a result of which, it was arranged that representatives of the Three Sands Oil Company should come to Daviess county during the following week for the purpose of inspecting appellants' properties. Some time in the early part of July, 1928, Gambril and another representative of the Three Sands Oil Company went to Owensboro and were introduced to Mr. Damron and Mr. Miller by appellee. In a conversation with Miller about this time, appellee informed him that Damron had promised him a commission at the rate of 5 per centum on sales made to any one introduced by him, but Miller objected when he learned that appellee's duties ceased when he procured a prospective purchaser and insisted that the commission under such circumstances should not exceed 3 per centum of any sales made, and to this appellee agreed. He took the representative of the Three Sands Oil Company to a lease owned by appellants, known as the Tompkins lease, on which were several producing oil wells. This lease was not the character of property desired by Gambril and his associate, and they were taken by appellee, with appellants' consent, to inspect another lease owned by appellants, known as the Tyler lease. There were two producing wells on this lease and two wells were being drilled. At a meeting that night in Owensboro, at which appellee was present, Gambril offered $50,000 for the lease, but appellants wanted $150,000. It was agreed that Gambril would return in a few days when the wells then being drilled were to be brought in, and that negotiations would be renewed. Gambril did return to Owensboro on July 9, but the parties were unable to agree on the terms on that occasion and appellants

claim the negotiations were dropped. They were renewed shortly thereafter, however, and resulted on August 17, 1928, in the purchase of a one-third interest in the Tyler lease by Gambril for the Three Sands Oil Company.

It is apparent that appellee's efforts were the procuring cause of the contract of sale. He brought the purchaser and seller together and initiated the negotiations that resulted within a reasonable time in the sale of the property. According to his version of the contract, he accomplished what he undertook to perform when he procured a purchaser and introduced him to the appellants. His duties then ceased, and as the negotiations thus commenced finally resulted in a sale of the property, he is entitled to his commission. The contract was neither indefinite nor uncertain, nor is there any evidence of abandonment by the appellee. The fact that he took no part in the negotiations after he brought the parties together did not constitute abandonment, since it was not a part of his duty to consummate the deal. Abandonment of the contract by appellee was neither pleaded nor proved. It follows that the circuit court did not err in overruling appellants' motion for a directed verdict.

Appellants complain of instruction No. 1 because it authorized the jury to find for the plaintiff if they believed he procured a purchaser while the contract was in effect. It is argued that as the contract was of indefinite duration the jury should have been told it continued in force for a reasonable length of time and if they believed the purchaser was procured and the sale consummated within a reasonable time they should find for the plaintiff. Hurst v. Williams, 102 S. W. 1176, 31 Ky. Law Rep. 658, is relied on. In that case the contract with the agent was made in the early part of April, 1903. The agent was to procure a purchaser for the timber on a certain tract of land. The owner of the land admitted entering into a contract, but claimed that it was limited in time to two weeks, or at least to a reasonable time, and that while the agent did introduce to him a prospective buyer about ten days after the contract was entered into, he was unable to make a sale either through his own or the agent's efforts, and the matter as between them was dropped and the contract closed. In the following September the

person who had been introduced to the owner by the agent returned to the owner, made an offer for a part of the timber, and it was sold to him. The agent had no part in this transaction, though it appears that under the contract the agent's duties did not end with the mere procurement of a prospective buyer. It was held that the jury should have been told that if they did not believe there was a time limit to the contract, then the sale must have been made or a purchaser procured within a reasonable time after the execution of the contract, and that they must determine from the facts and circumstances surrounding the transaction and the character of the business as to what was a reasonable time.

The facts of the instant case distinguish it from the Hurst Case. Here the appellee procured and introduced to appellants a prospective buyer, and under his version of the contract this constituted upon his part a performance of all the duties required of him. He procured a purchaser promptly, and only a short period of time elapsed between the beginning of negotiations and the consummation of the deal. While the matter was temporarily dropped after the prospective buyers' second visit to Owensboro, the negotiations were soon renewed, and within a few days the sale was made. In the circumstances the instruction complained of was not prejudicially erroneous.

It is finally insisted that the contract between the appellants and appellee is unenforceable because appellee had failed to procure a real estate broker's license as required by the occupational ordinance of the city of Owensboro and that the circuit court erred in sustaining the demurrer to the amended answer. Appellee was not engaged in the brokerage business, and so far as the record discloses the transaction in question was a single, isolated one. A person engaged in another business, who acts as a broker on a single occasion but not as a regular business, is not required to procure a brokerage license to entitle him to recover his commission.

In West v. Kirtley, 201 Ky. 335, 256 S. W. 724, 725, the facts were similar to the facts here, and in the opinion in that case the court said:

"The evidence shows that appellee was not engaged

in the brokerage business; that he had never before engaged in a similar transaction for the purchase or sale of lands for another. It is therefore apparent that the license fee of $25 assessed against such brokers, under section 4224, Ky. Stats., was not required of him before he could enter into a binding contract for a single transaction. All the evidence shows that he was not engaged as such broker, and was not in fact employed as a broker to sell the land for West; but the agreement between them was merely that, if he would put West in touch with oil men who would lease his property, he should be paid a certain percentage of the lease price, while West himself would conduct the negotiations and close the deal. At any rate, a single transaction by one for another for compensation, when he does not profess to and does not in fact follow the brokerage business, does not constitute him a broker in such sense that he must have a license before he can enter into a binding contract.''

Furthermore, it is apparent that the ordinance relied upon is simply a revenue measure and not a police regulation, and consequently a real estate agent who had not procured a license would not be precluded from recovering his commission. Tussey v. Felty, 206 Ky. 506, 267 S. W. 765; Howard v. Lebby, 197 Ky. 324, 246 S. W. 828, 30 A. L. R. 830.

The judgment is affirmed.